Miquiel BANKS, Plaintiff–Appellant,

v.

IGOV TECHNOLOGIES, INC., Defendant–Appellee.

No. 15-14943

Non-Argument Calendar

United States Court of Appeals, Eleventh Circuit.

Filed: 09/28/2016

Steven David Brown, Alison D. Hurt, IslerDare, PC, Richmond, VA, for Defendant–Appellee

Before WILLIAM PRYOR, JULIE CARNES, and FAY, Circuit Judges.

PER CURIAM:

Plaintiff–Appellant Miquiel Banks ("Plaintiff") appeals the district court's grant of summary judgment to Defendant–Appellee iGov Technologies, Inc. ("Defendant") on his *pro se* employment action for race discrimination and retaliation asserted under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* After careful review of the briefs and record, we affirm.

## BACKGROUND

### I. Factual Background

#### A. Plaintiff's Hiring

Plaintiff, who is African–American, began working as a technical writer supporting the Combat Operations Command ("COC") project in Defendant's Tampa, Florida office in October 2012. Plaintiff originally reported to Sean Kenney, the Program Manager for COC. Beginning in March 2013, Plaintiff reported to Joey Williams, the Deputy Program Manager. Plaintiff was hired as the only full-time salaried technical writer. As such, Plaintiff's work was expected to be "substantially error free, grammatically correct, and properly formatted." Plaintiff does not contest this expectation, but he asserts that he was held to a higher standard than the other writers in the office. It is undisputed, however, that the other writers were subcontractors who were paid by the hour and had different duties and responsibilities than Plaintiff.

When he was hired, Plaintiff signed an acknowledgement form indicating that he

Miquiel Banks, Pro Se

had read Defendant's employee handbook outlining its policies and procedures. The handbook stated that employees must work eight hours a day, five days a week during their designated core work hours. Plaintiff's core work hours were from 8 A.M. to 5 P.M. Because Plaintiff was enrolled as a college student when he was first hired, Defendant temporarily accommodated his work schedule on the days that he had class. After Plaintiff's first semester, Kenney granted Plaintiff's request to extend the temporary accommodation through the spring semester.

Apart from his accommodated schedule, Plaintiff was expected to follow the policies laid out in the handbook. Included among those policies was the expectation that every employee work 40 hours a week. Further, an employee was expected to notify a manager and obtain approval for any anticipated tardiness or absence. The handbook emphasized that regular attendance and punctuality were essential conditions of employment and that poor attendance or excessive tardiness would lead to disciplinary action, up to and including termination.

### B. Plaintiff's Initial Misconduct and Human Resources Complaint

Just a few months into Plaintiff's employment, in February 2013, Williams and Kenney began noticing problems with his work product, dress, and attendance. On February 25, 2013, Kenney reminded Plaintiff of Defendant's attendance policy and made clear that Plaintiff needed to discuss absences ahead of time with Williams. On April 1, 2013, Plaintiff in-

formed Williams at 3:56 P.M. that he was leaving for the afternoon and would be gone the next day. Williams advised Plaintiff that he needed to request time off prior to taking it, and then he reported his concerns about Plaintiff to Human Resources Vice President Kim Schmitt on April 3, 2013. On that same date, Plaintiff sent an email to human resources stating that "something [wa]s amiss at igov."

On the morning of April 5, 2013, Williams met with Plaintiff to address his concerns.[1] Williams subsequently emailed Schmitt and Kenney a summary of the meeting. According to the summary, Williams informed Plaintiff that he needed to adhere to the handbook regarding requests for time off and personal appearance-specifically advising him that sweatpants are inappropriate "even on Casual Friday."[2] Williams also provided Plaintiff examples of his poor work product. In addition, Williams informed Plaintiff that (1) he was not the "lead" technical writer, (2) everyone was held to the same standards, and (3) Plaintiff would need to meet with Williams again in 30 days to assess Plaintiff's improvement.

Three days later, Plaintiff filed a human resources complaint. The complaint verified the summary of Plaintiff's meeting with Williams and asked for clarification as to whether Plaintiff was the lead technical writer and whether he was required to quit school to continue his employment with Defendant. The complaint did not allege any discrimination by Defendant; rather it centered on Plaintiff's annoyance with various co-workers.[3]

---

1. Plaintiff stated in his summary judgment response that he was "not aware" of this meeting, but he referred to the meeting in his complaint.

2. The handbook stated that employees are expected to wear appropriate business/casual

attire on Friday, which could include jeans and athletic shoes but not sweatpants.

3. For example, Plaintiff complained about co-worker Eugenia Kolasinski responding to his question as to why she dressed up for work with "If you want to go to the top, then you

Defendant took multiple steps to address the problems Plaintiff raised in his complaint, including holding a mandatory staff meeting to address "respect in the workplace." Additionally, Schmitt met with Plaintiff to review his human resources complaint on April 12, 2013. A copy of Schmitt's notes from the meeting show that she informed Plaintiff that (1) he was not the lead technical writer, (2) his school hours were a temporary accommodation that had ended and would not be extended, (3) all of Plaintiff's work, including drafts, must be approved by Williams before being released, and (4) Plaintiff should work with Williams and Kenney to remain a productive member of the team. After the meeting, Plaintiff sent an email to Schmitt stating, "Thanks again for the incredible phone call and walking me through how to resolve my issues, worked like a charm! The work environment has improved a great deal and things are slowing [sic] blending into a cohesive corporate climate." Schmitt indicated that she took no further action after receiving Plaintiff's April 30, 2013 email because she believed Plaintiff's problems had been resolved.

### C. Plaintiff's Continuing Misconduct and Disciplinary Action

Plaintiff's performance, however, did not improve after the discussions described above. On April 29, 2013, Plaintiff again told Williams he was leaving the office early without getting permission beforehand. Williams and Kenney informed Schmitt of the incident and met with Plaintiff on April 30, 2013 to once again review Defendant's policies on requesting time off and leaving early. On May 10, 2013, Plaintiff announced to Williams that he would be in an hour late at 9 A.M. because "it's

have to dress the part" and looking askance at his clothes, Plaintiff's feeling that Kolasinski and another co-worker Ralph Hoover were inappropriately going out to lunch to-

going to be a LONG DAY." On June 24, 2013, Plaintiff was late getting into the office and left at 3:30 PM without giving Williams or Kenney any reason for his absence. Plaintiff admits that he changed his schedule without permission at various times during his employment, but he argues that this was normal in the workplace and that he was the only worker punished for it.

In addition to Plaintiff's attendance problems, Williams and Kenney repeatedly found errors in Plaintiff's work. On May 6, 2013, Plaintiff submitted an assignment to Williams with typographical and grammatical errors. Williams asked Plaintiff to correct the errors, but Plaintiff re-submitted the assignment without the corrections. On June 4, 2013, Plaintiff left early without checking in with Williams or Kenney. Prior to leaving, he submitted an assignment to Kenney, due to be passed on to the client, that contained errors. In addition, Kenney started receiving complaints from other managers about errors in Plaintiff's work. Once again, Plaintiff does not deny that these incidents happened, but he claims that he was held to a higher standard than the other writers and that the cited examples are only a few out of many assignments he prepared during his employment.

Due to his ongoing performance problems, Kenney, Williams, and Schmitt presented Plaintiff with a disciplinary form on July 1, 2013. The form advised Plaintiff that immediate improvement was necessary to avoid additional discipline or termination, and that there would be a review of his progress in 30 days. Plaintiff refused to sign the form.

gether, the "LOUD and IRRITATING" conversations from the engineering team, and co-worker David Nowak moving Plaintiff's keyboard to test his own.

Even after receiving the form, Plaintiff's conduct did not improve. Throughout July and August 2013, Plaintiff continued to change his hours without informing his managers and to submit work that contained errors. In August 2013, Defendants discovered that Plaintiff had unauthorized programming on his computer. Around the same time, Plaintiff started having an issue with his coworker, Dwight Durham. Specifically, Plaintiff complained that Durham "sneezes all over his hands and his keyboard and mouse and then eats LUNCH without washing or cleaning his hands and then wants to come over and shake hands with the Plaintiff." Plaintiff requested supplies from Williams in order to deal with this "medical problem." He claims that he was the only worker required to ask Williams for supplies, and that this is another example of discrimination towards him.

On August 22, 2013, when Williams was unable to find Plaintiff at 4:40 P.M., he sent Plaintiff an email asking what time he had left for the day. Plaintiff did not reply to the email; instead, he forwarded the email to human resources and requested "HR's position on 'Toxic Work Environment', 'Harassment', and treating all employees equally." On August 29, 2013, Plaintiff received a performance improvement plan from Schmitt, Williams, and Kenney. The plan highlighted Plaintiff's continuing problems with attendance and work product. It stated that Plaintiff must show "immediate improvement" and made clear that his failure to do so could result in immediate termination.

### D. Plaintiff's Termination

On Friday, September 12, 2013, the staff was asked to wear blue jeans, in accordance with Defendant's casual Friday dress code, in order to help set up a tent. Plaintiff arrived at work in sweatpants and a cut off t-shirt and was instructed to go home and change. Sweatpants were forbidden by Defendant's dress code and Plaintiff had been told previously not to wear them. Plaintiff does not deny that he was wearing sweatpants. Instead, he states that other people were also not in proper dress code because they were wearing athletic shoes. As noted, however, athletic shoes were permitted as appropriate casual Friday attire. After Plaintiff went home to change, he was called into a meeting with Williams, Kenney, Schmitt, and two human resources employees. Plaintiff's employment was terminated at this meeting due to his consistent misconduct.

### II. Procedural History

Plaintiff subsequently filed this *pro se* action against Defendant, Schmitt, Kenney, Williams, and several of his co-workers. In his complaint, Plaintiff asserted whistleblower, race discrimination, harassment, hostile work environment, and retaliation claims, all of which he alleged to arise under Title VII. In response to a motion to dismiss filed by Defendants, Plaintiff clarified that he intended to pursue only the race discrimination and retaliation claims against Defendant iGov. Based on the clarification, the district court granted the motion to dismiss, leaving only Plaintiff's race discrimination and retaliation claims against Defendant remaining in the case.

Following a contentious discovery process,[4] the district court granted Defendant's motion for summary judgment. Specifically, the court determined that Plaintiff had failed to establish a prima

---

4. Plaintiff repeatedly failed to respond to discovery requests and to comply with procedural rules. The district court ultimately found that Plaintiff's non-compliance amounted to willful disobedience and imposed sanctions.

facie case of discrimination because he (1) could not show he was qualified for his job and (2) did not present evidence of a comparator outside his protected class who was treated more favorably than Plaintiff. Alternatively, the court noted that Plaintiff had not produced any evidence to rebut the legitimate, non-discriminatory reasons offered by Defendant for firing him. As to the retaliation claim, the court found that Plaintiff had failed to establish a prima facie case because he could not show that he had engaged in statutorily protected activity or that any such activity was the cause of his termination. Plaintiff appeals both rulings.[5]

## DISCUSSION

### I. Standard of Review

We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)). We liberally construe *pro se* pleadings; however, "the plaintiff must still meet the essential burden of establishing that there is a genuine issue as to a fact material to his case." *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).

### II. Plaintiff's Race Discrimination Claim

Title VII prohibits discrimination against an individual in the terms or conditions of his employment on the basis of race. 42 U.S.C. § 2000e–2(a)(1). Plaintiff has not produced any direct evidence of discrimination. Thus, we employ the burden-shifting framework set out in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to determine whether summary judgment is warranted on his Title VII claim. *See Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1335 (11th Cir. 2015). Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. *Id.* at 1336. Assuming that burden is met, the defendant can rebut the resulting presumption of discrimination by providing a legitimate, non-discriminatory reason for any adverse action taken against the plaintiff. *Id.* The plaintiff then has an opportunity to show that the proffered reason is a pretext for discrimination. *Id.*

We agree with the district court that Plaintiff's claim fails at the first step of the analysis. To establish a prima facie case of race discrimination, Plaintiff must show that (1) he is a member of a protected racial class, (2) he was qualified for his position, (3) he experienced an adverse employment action, and (4) he received less favorable treatment than a similarly situated person outside of his protected class.[6] *Id.* Assuming the first three prongs

---

**5.** Plaintiff also asserts in his reply brief that the district court erred by sanctioning him for discovery abuses. We need not address that argument, as it was raised for the first time in the reply brief. *See United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004) ("[This Court] repeatedly has refused to consider issues raised for the first time in an appellant's reply brief.").

**6.** A plaintiff can also establish a prima facie case by showing that he was qualified for the job, but was fired and replaced by someone outside his class. *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984). Although Plaintiff did not raise the argument below, he argues in his reply brief that Ms. Kolasinski has "'essentially' replaced him." Again, we need not address an

are satisfied, there is no evidence to suggest Plaintiff was treated less favorably than a similarly situated person outside of his protected class.

In support of his discrimination claim, Plaintiff asserts that his co-workers deviated from their core work hours just as he did, but were not reprimanded or terminated. As evidence of this fact, Plaintiff provides his personal recordings of times when co-workers arrived to work late or left early. However, Plaintiff was not reprimanded for arriving to work late or leaving early, but rather for failing to notify his manager and get approval for any change in his core working hours as required by Defendant's policy. Plaintiff also asserts that his co-workers wore athletic shoes on casual Friday, but that he was the only one reprimanded for violating Defendant's dress code. Again, Plaintiff was reprimanded for wearing sweatpants, not for his shoes, and athletic shoes are expressly permitted on casual Friday according to the handbook. Finally, Plaintiff points to instances where he was asked to fix content errors made by his co-workers as proof of his own competency and of the fact that his co-workers sometimes failed to meet work standards and were not reprimanded. Yet, Plaintiff provides no evidence that his co-workers committed the same quantity or type of work errors as he committed.

Most fatal to Plaintiff's claim is that he fails to point to any other worker who was similarly situated to him in regard to his entire disciplinary history. *See Holifield,* 115 F.3d at 1562 ("In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether employees are involved in or accused of the same or similar conduct and are disciplined in different ways."). Plaintiff does not identify

any co-worker who consistently had problems with communication, attendance, dress code, *and* work product. *See Burke-Fowler v. Orange Cty., Fla.,* 447 F.3d 1319, 1325 (11th Cir. 2006) (noting that "[d]ifferent types and degrees of misconduct may warrant different types and degrees of discipline"). Nor does he identify any co-worker who failed to improve after multiple warnings and was still retained by Defendant. Based on the record before us, the quantity and quality of Plaintiff's misconduct simply does not compare to any of his co-workers.

We recognize that a plaintiff will survive summary judgment even without comparator evidence as long as he presents some other circumstantial evidence that raises a question of fact as to the employer's discriminatory intent. *See Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011) ("[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."). However, Plaintiff's conclusory assertion that he was treated differently than his co-workers because he is "the ONLY BLACK PERSON in COC" does not accomplish this task. Because Plaintiff has failed to establish a prima facie case of discrimination under *McDonnell Douglas,* or to produce any other circumstantial evidence of discrimination, summary judgment is warranted on his race discrimination claim.

## III. Title VII Retaliation Claim

Title VII prohibits an employer from retaliating against an individual "because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). To prevail

argument raised for the first time in a reply brief. *See Levy,* 379 F.3d at 1244.

on a Title VII retaliation claim based on circumstantial evidence, a plaintiff must first establish a prima facie case by showing: "(1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that the adverse employment action was causally related to the protected activity." *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998). As to the causation element, the protected activity must be a "but-for" cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —— U.S. ——, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013).

■ Plaintiff suffered a materially adverse action when his employment was terminated in September 2013, but we agree with the district court that he has failed to show he engaged in statutorily protected activity that caused his termination. A plaintiff engages in statutorily protected activity when he complains about an action that he reasonably believed was unlawful under Title VII. *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). This standard has both a subjective and an objective component. *Id.* Plaintiff must show that "he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices" and that "his belief was *objectively* reasonable in light of the facts and record presented." *Id.*

Plaintiff does not specify which of his complaints allegedly caused his termination. To the extent Plaintiff is relying on his human resources complaint or the email he sent to human resources in April 2013, those communications do not refer to any unlawful employment action by Defendant: the complaint focuses on Plaintiff's annoyance with co-workers who he deemed to be too loud or who questioned the way Plaintiff dressed; the email simply states

that something is "amiss." Moreover, the complaint and the email occurred five months prior to Plaintiff's termination and are thus too attenuated to support his retaliation claim without some additional evidence of causation, which Plaintiff fails to provide. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

The other emails Plaintiff sent to human resources during his employment include: (1) a July 9, 2013 email asking for clarification as to whether the core work hours apply only to Plaintiff; (2) a July 26, 2013 email in which Plaintiff provided examples of the workflow problems between himself, Williams, and Kenney; (3) an August 21, 2013 email describing Plaintiff's complaint about Durham's sneezing; and (4) an August 23, 2013 email in which Plaintiff forwarded a message from Williams asking Plaintiff what time he had left the previous day. The first three emails do not describe or allege any unlawful employment action by Defendant, and thus cannot be reasonably interpreted to constitute statutorily protected activity.

Although it does not allege race discrimination, the August 23, 2013 email vaguely references "harassment" and "unequal treatment of employees." Thus, we assume for purposes of this appeal that Plaintiff subjectively believed he was opposing unlawful discrimination by Defendant when he sent the email. Nevertheless, Plaintiff fails to show that his belief was objectively reasonable. The specific conduct Plaintiff complained about in the August 23 email was that Williams had asked Plaintiff what time he had left the previous day. Plaintiff could not have reasonably believed that conduct was unlawful: Defendant's policy required Plaintiff to notify Williams when he left early, and Plaintiff had repeatedly received guidance on the policy over the course of several months in the form of

meetings, a disciplinary form, and a performance improvement plan.

We emphasize once again that establishing a prima facie case is not the only way to prevail on a Title VII claim based on circumstantial evidence. *See Hamilton*, 680 F.3d at 1320 (noting that a plaintiff can survive summary judgment by providing enough circumstantial evidence to create a triable issue as to the employer's discriminatory intent). But Plaintiff does not present any circumstantial evidence that he was terminated in retaliation for his complaints about race discrimination. Accordingly, the district court did not err in granting summary judgment as to Plaintiff's retaliation claim.

## CONCLUSION

For the reasons above, we **AFFIRM** the judgment of the district court.